**ORDERED in the Southern District of Florida on November 12, 2026.**

**Peter D. Russin, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

Kendall Odell Lathers, Case No. 25-11757-PDR

Debtor. Chapter 7
_______________________________/

Axos Bank,

Plaintiff, Adv. Proc. No. 25-01147-PDR
v.

Kendall Odell Lathers,

Defendant.
_______________________________/

## MEMORANDUM OPINION AND ORDER

Axos Bank mistakenly deposited the proceeds of one loan into Kendall Lathers's bank account twice. Lathers received and spent both deposits. Axos seeks a judgment for the duplicate $49,500.00 deposit and a determination that the judgment is excepted from Lathers's discharge. The parties have reduced the case to

two questions: whether Lathers converted Axos's money, and whether he intended the resulting injury. On the first, Florida conversion law asks only whether Lathers wrongfully exercised dominion over the money. He did. On the second question, § 523(a)(6) asks, where the injured property is money commingled in the debtor's own account, whether Lathers knew, at the time he spent the money that caused the loss, that the money was Axos's rather than his own, and whether he intended, or knew to a substantial certainty, that spending the money would injure Axos. The answer to that question is more complicated.

Under Florida law, a recipient may convert a mistaken transfer even if he initially believed he was entitled to it, because the tort does not require an intent to deprive the owner of the property.[1] The discharge exception for a willful and malicious injury requires more: Axos must prove an intentional injury, not merely an intentional act.[2] Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[3]

---

[1] *See Seymour v. Adams*, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994) (conversion "may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action"); *City of Cars, Inc. v. Simms*, 526 So. 2d 119, 120 (Fla. 5th DCA 1988) (conversion does not require specific wrongful mental intent); *BMO Harris Bank, N.A. v. Richert* (*In re Richert*), 632 B.R. 877, 893 (Bankr. M.D. Fla. 2021) (conversion requires "(1) an act of dominion wrongfully asserted, (2) over plaintiff's property, that is (3) inconsistent with plaintiff's ownership therein"); *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1285 (S.D. Fla. 2021).

[2] *See Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998); *Interamerican Asset Mgmt. Fund Ltd. v. Ortega T. (In re Ortega T.)*, 573 B.R. 284, 295–96 (Bankr. S.D. Fla. 2017).

[3] 11 U.S.C. § 523(a)(6).

Applied to a vandalized car, the statute is not hard to apply: the injury is the damage to the car, and the debtor meant to cause it. Money is harder.

A vandal who smashes a windshield cannot claim he only meant to swing the sledgehammer. The act and the injury are the same event, and intent to do the one is intent to do the other. Money breaks that equivalence. Spending money is not an act of destruction; it is the only thing money is for, and a debtor who spends freely from an account is doing exactly what every debtor does every day. That means Section 523(a)(6) has to ask more of a creditor in a money case than it asks in a vandalism case because the ordinary, blameless use of money looks identical to the conduct the statute condemns. The creditor cannot rest on proof that the debtor meant to spend money, or even that he knew some of the money he was spending might not be his.

If spending another person's money were itself the injury, Section 523(a)(6) would reach almost every unpaid debt, since very few debtors hold a creditor's money untouched; nearly all of them spend it, on rent, on payroll, on a business they are trying to save, and later find they cannot pay it back. That cannot be the rule, or the "fresh start" that bankruptcy promises insolvent debtors would exclude from its benefit anyone who had spent money before going broke.

What separates ordinary spending from the functional equivalent of burning the money cannot be that the money is spent, but the debtor's state of mind at the moment he spends it. He must know the money is not his, and he must know that spending it will take it away from the person to whom it belongs.

This case turns on that distinction. Lathers knew within days that a second $49,500.00 payment from Axos was not legitimately his. The harder question is whether Axos proved that, at the time of any given withdrawal, Lathers knew he was depleting Axos's specific money, rather than simply drawing down a larger pool of his own funds that happened, for a time, to contain it.

After considering the stipulated facts, the admitted exhibits, the trial transcript, and the parties' written closing arguments, the Court finds that Axos proved its conversion claim but did not prove the resulting debt is excepted from Lathers's discharge.

## I. JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), which gives the district courts jurisdiction over all civil proceedings arising under title 11, or arising in or related to a case under title 11. This proceeding arises in Lathers's Chapter 7 case, and the district court has referred it to this Court under 28 U.S.C. § 157(a) and this district's Local Rule 87.2.

Count IV, Axos's claim that the debt is excepted from discharge under 11 U.S.C. § 523(a)(6), is a core proceeding under 28 U.S.C. § 157(b)(2)(I), which lists "determinations as to the dischargeability of particular debts" among the matters a bankruptcy judge may hear and determine. The Court accordingly has both statutory and constitutional authority to enter final judgment on Count IV.

Count III, the conversion claim, is different. A claim between private parties for conversion of money is the kind of state law claim that, under *Stern v. Marshall*,[4] a bankruptcy court may lack constitutional authority to finally decide even when a statute labels it core. The Court need not resolve whether Count III is core on its own, because two independent grounds support entering final judgment on it here. First, Count III and Count IV are not severable: the debt Count III would fix is the same debt whose dischargeability Count IV asks the Court to decide, and the authority to determine dischargeability under Section 523(a)(6) carries with it the authority to determine the underlying debt. Second, and independently, the parties consented to this Court entering final judgment on Count III. The Court's Order Setting Scheduling Conference and Establishing Procedures and Deadlines, entered May 20, 2025,[5] required any party objecting to this Court's entry of final orders or judgments in this proceeding to file a motion under FRBP 7016(b) not later than two business days before the scheduling conference, and provided that failing to do so "constitutes consent by such party to this Court entering all appropriate final orders and judgments in this proceeding." No party filed such a motion.[6] That consent was triggered in August 2025, while Lathers was represented by counsel;[7] it does not rest

[4] 564 U.S. 462 (2011).

[5] Order Setting Scheduling Conference and Establishing Procedures and Deadlines ¶ 3 (Dkt. No. 5).

[6] Adv. Proc. No. 25-01147-PDR docket (reflecting no motion filed under Fed. R. Bankr. P. 7016(b) as of the date of this Opinion).

[7] Order Setting Scheduling Conference and Establishing Procedures and Deadlines at 1 (Dkt. No. 5) (setting scheduling conference for August 6, 2025); Answer & Affirmative Defenses (Dkt. No. 18); Debtor's Counsel's Mot. to Withdraw (Dkt. No. 57).

on the silence of an unrepresented litigant. Although Lathers's Answer included a boilerplate subject matter jurisdiction defense, he abandoned it in the Final Pretrial Order and raised no objection to this Court's authority at any later stage, including after he elected to proceed pro se in May 2026.[8] The Supreme Court has held that consent of this kind, whether express or implied from a party's litigation conduct, satisfies Article III.[9]

Venue is proper under 28 U.S.C. § 1409(a), which places venue of a proceeding arising in or related to a case under title 11 in the district where that case is pending. Lathers's Chapter 7 case is pending in this district.

## II. PROCEDURAL HISTORY

Axos filed this adversary proceeding asserting breach of contract, unjust enrichment, conversion, and nondischargeability for willful and malicious injury.[10] Lathers, then represented by counsel, answered with a general denial, admitting the jurisdictional allegations only and denying or disclaiming knowledge of the remainder, including the allegations that he knowingly retained and used an erroneous deposit. He proceeded pro se by the time of trial.[11]

The Court previously granted summary judgment for Lathers on Count I and denied it on the remaining counts, because Lathers's state of mind could not be

---

[8] Order Granting Debtor's Counsel's Mot. to Withdraw (Dkt. No. 60).

[9] *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665, 683–85 (2015).

[10] Compl. ¶¶ 20–44 (Dkt. No. 1).

[11] Answer & Affirmative Defenses ¶¶ 1–2 (Dkt. No. 18); Def.'s Written Closing Arg. at 6 (Dkt. No. 94).

resolved without assessing his credibility; that ruling is treated here as the law of the case.[12] The Final Pretrial Order later superseded the pleadings, limited trial to Counts III and IV, and identified no unresolved legal issue touching Count II.[13]

The Court tried the case on October 1, 2026. Axos called Brian Shellmire, its vice president of consumer collections, as its corporate representative, and called Lathers as an adverse witness; Lathers then testified in his own case and rested without offering further witnesses or exhibits.[14] The Court admitted Plaintiff's Exhibits 1, 2, and 5 through 10;[15] Exhibits 1 and 2 were admitted only as background on the loan and the funding mechanism, with the Court noting that it would give each exhibit the weight it deserved on the issues to be tried.[16] Exhibit 8 was admitted only to show that Axos gave Lathers notice of the duplicate deposit, not for the truth of the statements it contains, and Exhibit 9 was admitted as an Axos business record showing the demand letter was sent, not as proof that Lathers received it.[17] Plaintiff's Exhibits 3 and 4 were marked for identification but never offered and are not part of the trial record. At the close of the evidence, the parties submitted written closing arguments in lieu of oral argument, which the Court has considered in full.

---

[12] Order Denying Pl.'s Mot. for Summ. J. at 2 (Dkt. No. 54).

[13] Final Pretrial Order at 3 (Dkt. No. 86).

[14] Trial Tr. 17:10–17, 54:14–55:4, 81:10–82:1 (Dkt. No. 93).

[15] Trial Tr. 82:4–13 (Dkt. No. 93).

[16] Trial Tr. 27:14–22, 33:18–24 (Dkt. No. 93).

[17] Trial Tr. 43:16–22, 47:14–48:3 (Dkt. No. 93).

## III. FINDINGS OF FACT

Lathers was arranging financing for a franchise acquisition in October 2023. He needed $30,000.00 within days and another sum, ultimately $165,100.00, for a closing originally expected in early January 2024. A loan broker submitted applications on his behalf to more than one lender, including Axos, SoFi, and First Tech Federal Credit Union, each for a loan in the range of $50,000.00 to $100,000.00.[18]

By October 31, Lathers reported to the broker that two of the three lenders had approved him and that he was still waiting on a decision from First Tech. Axos's underwriting separately asked him to confirm that he had canceled or been declined by First Tech before Axos would fund his loan. On November 1, 2023, the same day he accepted Axos's Note, Lathers told the broker that First Tech had finally responded and that, "[b]ased on the APR quoted over the phone and what they provided in email communication, I had just withdrawn that application and went with Axos."[19] A fourth lender, LightStream, entered the picture only after this exchange; the loan processor's own list did not include it, and at trial Lathers could not say when or how it was added.[20]

That same day, Lathers electronically accepted Axos's promissory note. The Note states a principal amount of $50,000.00, an origination fee of $500.00, and net

---

[18] Pl.'s Ex. 10 (Dkt. No. 81-10); Trial Tr. 65:20–66:25 (Dkt. No. 93).

[19] Pl.'s Ex. 10 (Dkt. No. 81-10); Trial Tr. 73:4–16 (Dkt. No. 93).

[20] Trial Tr. 68:21–69:18 (Dkt. No. 93).

proceeds of $49,500.00.[21] Lathers therefore knew exactly how much Axos was to deposit and exactly what he was borrowing.

Axos initiated the promised $49,500.00 ACH transfer to Lathers's USAA checking account ending in 4161. An internal error caused Axos to initiate an identical second deposit. Both posted on November 1, 2023. Each was for $49,500.00.[22] Each was identified on the USAA statement as an ACH deposit from "AXOS BANK," with nothing in the description pointing to any other lender, and Lathers does not contest that both deposits came from Axos.[23] Axos's corporate representative, Brian Shellmire, testified that Axos intended only one such deposit, that the second was an internal error that Lathers played no part in causing, and that Axos did not discover the duplication until its next quarterly account reconciliation, roughly 105 days later.[24] Axos then tried to reverse the second deposit but could not, because the ACH recall window, which Shellmire testified is ordinarily about thirty days, had already closed.[25]

The parties stipulated that Lathers expected $49,500.00 from Axos, not $99,000.00, and that he ultimately spent the entire duplicate deposit.[26] They also

---

[21] Note at 1–2, ¶¶ 1–2 (Dkt. No. 81-1); Trial Tr. 28:16–29:11 (Dkt. No. 93).

[22] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-5); Trial Tr. 62:4–25 (Dkt. No. 93).

[23] Trial Tr. 62:17–25 (Dkt. No. 93).

[24] Trial Tr. 38:14–39:22, 49:13–50:5 (Dkt. No. 93).

[25] Trial Tr. 40:1–16 (Dkt. No. 93).

[26] Final Pretrial Order at 2 (Dkt. No. 86).

stipulated, on the record at the start of trial, that he has never returned any of it and that Axos has recovered none of it.[27]

Lathers testified that his life was in transition that week. He had separated from a twenty-year career in military and civilian government logistics and supply-chain work with his last day on "the 31st of November [sic]" 2023. He continued to teach part-time as an adjunct instructor in business and supply-chain operations, a position he has held since 2014.[28] He was relocating from Alabama to Florida that same month, and the lease he had arranged for his new home fell through en route, so that he stayed with a relative in Orlando for about a week before finding other housing.[29] At the same time, he was finalizing the acquisition of a franchise he estimated at trial to cost about $205,000.00 in the aggregate, with $30,000.00 due at signing and the balance due at a closing he originally expected in early January 2024.[30]

Lathers holds a doctorate in business administration with a concentration in global operations and supply-chain management, and he agreed at trial that it is fair to call him "a well-educated man."[31] He also testified that he has applied for loans

---

[27] Trial Tr. 12:11–15 (Dkt. No. 93); Def.'s Resp. to Pl.'s First Req. for Admis. Nos. 9, 10 (Dkt. No. 41-2).

[28] Trial Tr. 56:3–57:3, 82:22–83:19 (Dkt. No. 93).

[29] Trial Tr. 84:20–85:10 (Dkt. No. 93).

[30] Trial Tr. 64:11–15, 79:17–19 (Dkt. No. 93).

[31] Trial Tr. 57:19–25 (Dkt. No. 93).

roughly ten to twelve times in his life and been approved about eighty percent of the time.[32] He resisted the premise that this background made him equally capable of parsing loan paperwork, testifying that understanding a loan document is "a legal blurb compared to business, and it's two different languages, in a sense," and, on being asked whether he was comfortable with bank statements, that he supposed so but "barely read[s] 'em."[33]

The account activity after November 1 shows what Lathers did, and did not do, with the money. On November 6, he wired $30,000.00 out of the account toward the mandatory franchise transfer fee, and the account still held $75,936.64 on November 10.[34] Before making that wire, Lathers testified that he checked only "the top number" of his balance rather than examining individual deposits, because he was tracking an aggregate acquisition cost of roughly $205,000.00 across several pending loans, not any single lender's contribution to it. The $99,000.00 he had received from Axos was well within the $200,000.00 total he was seeking, so he did not notice it one way or the other.[35]

On November 30, a second lender deposited $100,000.00, identified on the statement as "SOFI PL DISB." The account held $149,411.40 as late as January 12,

---

[32] Trial Tr. 58:18–59:19 (Dkt. No. 93).

[33] Trial Tr. 58:1–17 (Dkt. No. 93).

[34] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-5); Trial Tr. 64:1–6 (Dkt. No. 93).

[35] Trial Tr. 64:21–65:18, 79:10–18 (Dkt. No. 93).

2024.[36] On January 25, 2024, a third lender deposited $75,000.00, identified as "LIGHTSTREAM LOAN FUNDS."[37] Four days later, on January 29, 2024, Lathers wired $165,100.00 out of the account for his franchise closing. Even after that wire, the account still held $55,521.50, more than the $49,500.00 Axos was owed for the mistaken deposit.[38] The balance first fell below $49,500.00 the next day, January 30, 2024: a $5,625.00 wire of unexplained purpose left $50,768.38, and a further $10,000.00 transfer to another checking account of Lathers's own, ending in 7529, brought the balance to $40,768.38. No witness was examined about either transaction, though Lathers testified more generally that he continued, over this period, to use the account to fund payroll and other costs of the business "until . . . revenue started to flow more smoothly." The balance stood at $32,407.29 by February 9, 2024.[39]

Lathers testified that he realized the second deposit was Axos's error "around the time of the 30k transfer withdrawal," which he fixed as about six days after the money arrived, on or about November 6 or 7, 2023, and that he understood by then that he "wasn't entitled to it."[40] Lathers testified that he expected Axos to

---

[36] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. Nos. 81-6, 81-7); Trial Tr. 76:5–14 (Dkt. No. 93).

[37] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-7); Trial Tr. 77:11–22 (Dkt. No. 93).

[38] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-7); Trial Tr. 87:1–16 (Dkt. No. 93).

[39] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-7); Trial Tr. 87:11–88:4 (Dkt. No. 93).

[40] Trial Tr. 80:6–8, 88:11–89:4 (Dkt. No. 93).

"automatically back that out" of the account and that he regarded the extra money, in the meantime, as "a blessing in disguise."[41]

Axos did not contact Lathers about the duplication until February 2024. Lathers testified that he recalled a phone call from Axos employee Jaquelin Cardenas shortly before she began emailing him.[42] Cardenas emailed Lathers on February 14, 2024, asking him to provide his November USAA statement "showing we only deposited your loan request of $50,000.00 once," and explaining that Axos needed it to document "an internal system issue" for its accounting department. She followed up on February 15, asking him to "validate we only sent you one deposit for $49,500.00," and again on February 16, asking him to "validate we did not deposit a duplicate of $49,500.00" and offering a three-way call with USAA to confirm it.[43] Lathers testified that he told Cardenas on the call that he would "look into it" and send the statement, but he never did.[44]

On March 1, 2024, Axos sent a written demand explaining the duplicate deposit and requiring Lathers to return the $49,500.00.[45] Lathers testified that he did not receive this letter, that it was mailed to his former Alabama address, and that

---

[41] Trial Tr. 85:17–25, 88:15–89:25 (Dkt. No. 93).

[42] Trial Tr. 91:24–92:7 (Dkt. No. 93).

[43] Pl.'s Ex. 8 (Dkt. No. 81-8) (admitted to show notice to Lathers, not for the truth of the matters asserted); Trial Tr. 43:16–45:6 (Dkt. No. 93).

[44] Trial Tr. 92:19–93:6 (Dkt. No. 93).

[45] Pl.'s Ex. 9 (Dkt. No. 81-9) (admitted as an Axos business record showing the letter was sent, not as proof it was received).

he had already relocated to Miami by that date; the Court admitted the letter only as a business record of Axos's, not as proof of receipt.[46]

Lathers did not provide the requested statement, did not join the proposed call, and did not return any portion of the money.[47] He testified that, after speaking with some of his employees and with the attorney handling his franchise acquisition — a privileged conversation the Court did not permit Axos to probe further[48] — he decided to let the matter "go through the legal proceedings" rather than cooperate further, and he agreed on cross-examination that this meant requiring Axos to obtain a judgment against him.[49] He testified that he intended to repay the money, but that losing more than $90,000.00 of his retirement savings to a cryptocurrency scheme in 2024, together with the collapse of the franchise business itself after the seller's financial records proved inaccurate, left him unable to do so, and that he has repaid none of it to date.[50] He also testified that he would have repaid the duplicate deposit had he not filed for bankruptcy.[51]

The Final Pretrial Order identified a single disputed fact for trial: whether Lathers reasonably believed that the duplicate deposit represented legitimate

---

[46] Trial Tr. 46:14–48:3 (Dkt. No. 93).

[47] Def.'s Resp. to Pl.'s First Req. for Admis. No. 8 (Dkt. No. 41-2); Trial Tr. 94:5–9 (Dkt. No. 93).

[48] Trial Tr. 93:7–94:4 (Dkt. No. 93) (sustaining the privilege once Lathers's counsel-related testimony was raised).

[49] Trial Tr. 94:16–95:7 (Dkt. No. 93).

[50] Trial Tr. 90:5–91:10 (Dkt. No. 93).

[51] Trial Tr. 9:9–10 (Dkt. No. 93).

proceeds of another pending loan application.[52] Lathers testified that he was not closely tracking his checking account against any single lender's contribution while three or four loan applications were pending at once. He points to the three months Axos took to discover its own error as corroborating that he had no reason, in the moment, to isolate the duplicate deposit from the rest.[53] That explains November 1 itself; it does not explain what followed. The two deposits were identical to the penny, arrived the same day, and were each identified as coming from "AXOS BANK."[54] No other pending application could have produced a matching deposit: Lathers had withdrawn his First Tech application that same day in favor of Axos, and SoFi and LightStream each funded weeks later, in different amounts, under their own names.[55] Lathers conceded on cross-examination that, as of November 1, 2023, Axos was the only loan he had actually accepted.[56]

The Court does not infer that Lathers recognized the duplication the instant it posted; he testified that he checked only "the top number" of his balance before making withdrawals, not the underlying line items,[57] and nothing in the record places him reading an itemized statement before Axos asked him to produce one in February

[52] Final Pretrial Order at 3 (Dkt. No. 86).

[53] Trial Tr. 63:17–21, 74:11–18 (Dkt. No. 93).

[54] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-5); Trial Tr. 62:17–19 (Dkt. No. 93).

[55] Trial Tr. 73:4–16 (Dkt. No. 93); Trial Tr. 76:5–14, 77:11–22 (Dkt. No. 93).

[56] Trial Tr. 78:23–79:1, 80:3–5 (Dkt. No. 93).

[57] Trial Tr. 79:13–14 (Dkt. No. 93).

2024. What the record does show is his own account of when he actually came to understand the mistake: he testified that he realized, no later than November 6 or 7, 2023, that the second deposit was an error and that he "wasn't entitled to it."[58] That admission, not an inference from what a careful reading of the statement would have shown, is what the Court's finding rests on.

Axos points to Lathers's doctorate in business administration and his history of successfully obtaining loans as proof that he understood, from the outset, exactly what he had received. The Court does not discount that background, but Lathers's own testimony that he does not read loan paperwork the way a lawyer would and "barely read[s]" his bank statements[59] limits how far it can carry Axos's case. General capability is evidence of what a person could have noticed, not of what he did notice. In February 2024, Axos asked Lathers three times, over three days, to produce the one document that would resolve any doubt: his own bank statement. He never did.[60] The Court finds that Lathers did not reasonably or honestly believe, for any meaningful length of time, that the second deposit came from another lender. He knew by early November 2023 that it was a second Axos deposit, and that he had no right to it.

---

[58] Trial Tr. 80:6–8, 88:11–89:4 (Dkt. No. 93).

[59] Trial Tr. 58:1–17 (Dkt. No. 93).

[60] Pl.'s Ex. 8 (Dkt. No. 81-8); Trial Tr. 92:19–93:6 (Dkt. No. 93).

## IV. CONCLUSIONS OF LAW

The Complaint asserts four counts against Lathers: breach of contract, unjust enrichment, conversion, and a request that the resulting debt be excepted from discharge under 11 U.S.C. § 523(a)(6). Two of the four are resolved before reaching the merits of Count III, and the Court addresses each count in the order the record disposes of it.

### A. Count I was resolved in Lathers's favor before trial.

Count I alleged that Lathers breached the Note by keeping money he never borrowed under it. The Note obligated Axos to advance net proceeds of $49,500.00 on a stated principal of $50,000.00, repayable in seventy-two installments of $985.07, and it obligated Lathers to repay that amount on those terms. Nothing in the Note extends Lathers's repayment obligation to money Axos did not intend to lend, and Lathers did not agree to borrow. The Note's attorneys' fee provision, for example, is triggered by a default in the borrower's obligations under the Note itself, not by the receipt of an unrelated, mistaken deposit.[61]

Axos's own Complaint recognized the gap: it pleaded unjust enrichment and conversion only in the alternative, "to the extent that the Erroneous Transfer is not covered by the terms of the Note."[62] The Court's summary judgment order resolved that alternative as a matter of law, holding that the allegations of the Complaint do

[61] Note ¶ 7 (Dkt. No. 81-1).

[62] Compl. ¶¶ 26, 34 (Dkt. No. 1).

not support a claim for breach of contract.[63] Nothing tried later altered that ruling, and the record identifies no provision of the Note that would bring the duplicate deposit within its terms. Consistent with the Court's summary judgment order, and with Lathers's own closing argument, which does not dispute the point, judgment is entered for Lathers on Count I.[64]

<u>B. Count II was eliminated by the Final Pretrial Order.</u>

Count II alleged unjust enrichment. The summary judgment order left that count unresolved, declining to rule on it in light of Lathers's acknowledgment that he owed the underlying debt.[65] Axos did not include Count II among the claims or legal issues to be tried in either the Joint Pretrial Stipulation or the Final Pretrial Order that superseded it.[66] A final pretrial order supersedes the pleadings and controls the course of the trial, and a claim Axos does not preserve for trial is no longer pending.[67] Count II is therefore dismissed as moot. Because Count II sought the identical $49,500.00 recovered on Count III, its dismissal has no effect on the amount Axos

[63] Order Denying Pl.'s Mot. for Summ. J. at 2 (Dkt. No. 54).

[64] Def.'s Written Closing Arg. at 1 (Dkt. No. 94).

[65] Order Denying Pl.'s Mot. for Summ. J. at 2 (Dkt. No. 54).

[66] Notice of Filing Joint Pretrial Stipulation (Dkt. No. 73); Final Pretrial Order at 3–4 (Dkt. No. 86).

[67] Fed. R. Civ. P. 16(e), made applicable by Fed. R. Bankr. P. 7016.

recovers, and the Court need not address the unjust enrichment authority Axos cites in its closing argument as an alternative basis for recovery.[68]

C. Axos proved conversion under Florida law.

The parties litigated the conversion claim under Florida law and identified no conflict requiring application of another state's law. Under Florida law, conversion is "an act of dominion wrongfully asserted over, and inconsistent with, another's possessory rights in personal property," and its elements are (1) an act of dominion wrongfully asserted, (2) over the plaintiff's property, that is (3) inconsistent with the plaintiff's ownership.[69] Money may be the subject of conversion when it consists of specific, identifiable funds that the defendant has an obligation to keep intact or deliver to the plaintiff.[70]

1. The money was specific and identifiable.

The converted property was not an undifferentiated contractual debt. It was one particular $49,500.00 ACH deposit, identified by amount, date, originating bank, and receiving account.[71] The funds also remained identifiable as a specific sum throughout the period Lathers held them: the account balance never fell below

---

[68] Pl.'s Written Closing Arg. (Dkt. No. 91) (citing, among other authority, *Duty Free World, Inc. v. Mia. Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018)).

[69] *Frayman*, 515 F. Supp. 3d at 1285 (internal quotation marks omitted); *Richert*, 632 B.R. at 893.

[70] *Frayman*, 515 F. Supp. 3d at 1285.

[71] Final Pretrial Order at 2 (Dkt. No. 86); Def.'s Resp. to Pl.'s First Req. for Admis. Nos. 1, 2, 4 (Dkt. No. 41-2); USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-5).

$49,500.00 between November 1, 2023, and January 29, 2024, so the duplicate deposit was never, as an accounting matter, spent apart from the rest of the balance until the January 30, 2024 transfers first reduced it below that amount.[72] Axos proved this element.

2. Axos owned the money and had an immediate right to its return.

Axos intended to make one $49,500.00 deposit under the Note. It made the second only because of an internal error, and no agreement entitled Lathers to it.[73] Axos therefore retained the superior right to the money and, once it discovered the error, had the immediate right to demand its return.[74]

3. Lathers exercised wrongful dominion and refused to return the money.

Lathers's dominion over the money became wrongful once he came to know, within days, that it was not legitimately his. He nonetheless retained the entire duplicate deposit and never returned any of it. Those facts establish dominion inconsistent with Axos's rights, independent of Axos's later demand. A good faith mistake would not change this result.[75] The elements of conversion under Florida law

---

[72] USAA Bank Statements (Acct. No. xxxxxx4161) (Dkt. Nos. 81-5 to 81-7); Trial Tr. 87:11–88:4 (Dkt. No. 93).

[73] Def.'s Resp. to Pl.'s First Req. for Admis. Nos. 2, 3, 5 (Dkt. No. 41-2); Trial Tr. 38:14–25 (Dkt. No. 93).

[74] *See Joseph v. Chanin*, 940 So. 2d 483, 486 (Fla. 4th DCA 2006); *Seymour*, 638 So. 2d at 1047.

[75] Def.'s Resp. to Pl.'s First Req. for Admis. Nos. 8, 9, 10 (Dkt. No. 41-2); Trial Tr. 80:20–24 (Dkt. No. 93). Some Florida authority ties conversion of money to a demand and a subsequent refusal to return it and suggests that a recipient who no longer holds the funds in an identifiable account by the time demand is made is not liable for conversion at all. See *Joseph v. Chanin*, 940 So. 2d 483, 486 & n.3 (Fla. 4th DCA 2006) (citing *Murrell v. Trio Towing Serv., Inc.*, 294 So. 2d 331, 332 (Fla. 3d DCA 1974)). That framework fits a recipient who has no reason to know the funds are not his own, where demand

do not include an intent to deprive the owner of the property, so even a defendant's mistaken belief that he is entitled to the property does not defeat the tort.[76] Here, Lathers understood he was not entitled to the money. Axos prevails on Count III.

4. Axos suffered $49,500.00 in damages.

Axos lost $49,500.00. Lathers returned none of it.[77] The amount is liquidated and undisputed, and Axos is entitled to judgment for $49,500.00 on Count III.

D. Axos has not proven that the conversion debt is excepted from discharge under 11 U.S.C. § 523(a)(6).

Count IV invokes the discharge exception for a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[78] Axos bears the burden of proof by a preponderance of the evidence.[79] Willfulness and malice are separate requirements, both of which Axos must prove. The Eleventh Circuit's most direct statement of the standard is in *Kane*: a debtor is responsible for a willful injury "when he or she commits an intentional act the purpose of which is to

---

is what first puts him on notice of the owner's claim. It does not fit this record. Lathers did not need Axos's demand to learn the money was not legitimately his; he knew that within days, from his own review of the transaction. *Joseph* itself recognizes that a recipient "could be held liable for conversion if she exercised dominion over the funds, knowing of [the owner's] claim," *id.* at 486, and the Court treats Lathers's wrongful dominion as arising from that independent, pre-demand knowledge, not from Axos's demand.

[76] *See Seymour*, 638 So. 2d at 1047; *City of Cars*, 526 So. 2d at 120.

[77] Final Pretrial Order at 2–3 (Dkt. No. 86); Trial Tr. 80:20–24 (Dkt. No. 93).

[78] 11 U.S.C. § 523(a)(6).

[79] *Grogan v. Garner*, 498 U.S. 279, 291 (1991) (preponderance of the evidence standard governs exceptions to discharge under 11 U.S.C. § 523(a)); accord *Kane v. Stewart Tilghman Fox & Bianchi, P.A.*, 755 F.3d 1285, 1293 (11th Cir. 2014).

cause injury or which is substantially certain to cause injury." While the Eleventh Circuit in *Kane* did not need to resolve whether substantial certainty is measured subjectively or objectively, this Court holds, consistent with prior decisions in this District, that in a financial injury case the substantial-certainty inquiry is subjective: the creditor must show the debtor actually knew his act was substantially certain to cause the injury, not merely that a reasonable person in his position would have known it.[80]

Indeed, even if substantial certainty were assessed under an objective standard, the result on this record would be the same: Axos introduced no evidence explaining the post-January 29 transactions or showing how Lathers's ordinary business draws from an account that had just received $224,500.00 in loan proceeds were substantially certain, at the time they were made, to prevent repayment of Axos's $49,500.00. And for the same evidentiary reasons, crediting Lathers's testimony that he expected an automatic bank reversal, tracked only his aggregate balance during an acute relocation and franchise-closing transition, and intended to repay the error until the franchise failed and he lost his retirement savings, Axos has not proven by a preponderance of the evidence that Lathers acted with malice.

---

[80] *Kane*, 755 F.3d at 1293 (quoting *Maxfield v. Jennings* (*In re Jennings*), 670 F.3d 1329, 1334 (11th Cir. 2012), and *Hope v. Walker* (*In re Walker*), 48 F.3d 1161, 1165 (11th Cir. 1995)); *Thomas v. Loveless* (*In re Thomas*), 288 F. App'x 547, 549 (11th Cir. 2008); *see also Fed. Trade Comm'n v. Rensin* (*In re Rensin*), 597 B.R. 177, 188–89 (Bankr. S.D. Fla. 2018) (adopting the subjective substantial-certainty standard for financial injuries lest willfulness collapse into the recklessness standard rejected in *Geiger*); *Ortega T.*, 573 B.R. at 296 (same); Order Denying Pl.'s Mot. for Summ. J. at 2 (Dkt. No. 54).

Because debtors rarely admit this kind of knowledge outright, the Court may rely on circumstantial evidence of what the debtor must actually have known when he acted.[81] Malice means conduct that is wrongful and without just cause or excuse, even without hatred, spite, or ill will, and it may be implied from the nature of the act; a separate showing of specific intent to harm is not required for malice.[82] The record requires the Court to consider two distinct periods: Lathers's conduct while the account held at least $49,500.00, from November 1, 2023, through January 29, 2024, and his conduct from January 30, 2024, when the balance first fell below that amount, forward.

A creditor seeking to except a debt for commingled money from discharge under Section 523(a)(6) must prove three things: that the debtor knew he held or was spending money not entirely his own; that, at the moment of the specific act that caused the loss, he knew his withdrawal was invading the funds attributable to this creditor rather than drawing on an undifferentiated pool of his own funds; and that he intended, or knew to a substantial certainty, that the act would injure this particular creditor. Proof of the first element alone describes an ordinary insolvent debtor's knowledge of an unpaid debt. It does not describe the willful and malicious injury the statute requires.

<u>1. The debt resulted from injury to Axos's property.</u>

[81] *Rensin*, 597 B.R. at 188–89.

[82] *Kane*, 755 F.3d at 1294 (quoting *Jennings*); *Rensin*, 597 B.R. at 189.

The injury was the deprivation of Axos's $49,500.00, the same injury for which Florida conversion law supplies the debt. Conversion of another's property without consent, done intentionally and without justification, can itself be a willful and malicious injury within the meaning of Section 523(a)(6).[83] Count IV therefore turns on whether Lathers willfully and maliciously caused that deprivation, and when.

2. Lathers's conduct while the account held Axos's money was not willful.

Axos is correct, as a matter of law, that no demand is required to make a debtor's conduct willful. A debtor who converts property with the knowledge and intent that Section 523(a)(6) requires injures the owner the moment he does so, regardless of whether the owner has yet asked for the property back. Axos is also right that its own February 2024 phone call and March 2024 letter would, at most, confirm an injury already complete rather than create one.[84] The question this record presents, then, is not whether a demand was necessary, but whether Axos proved the injury a demand would only have confirmed. Did Axos prove that at some point, independent of any demand, Lathers knew his own conduct was substantially certain to take Axos's specific $49,500.00 away from it?

---

[83] 4 Collier on Bankruptcy ¶ 523.12 (16th ed. 2024); see *Nutrien Ag Sols., Inc. v. Hall (In re Hall)*, 673 B.R. 817, 857–59 (Bankr. M.D. Fla. 2025) (conversion of a creditor's property found nondischargeable under § 523(a)(6)); *Kane*, 755 F.3d at 1293 (applying § 523(a)(6) to a purely financial injury — an attorney's deliberate underpayment of co-counsel through a concealed settlement — rather than to tangible property).

[84] Pl.'s Written Closing Arg. at 7–8 (Dkt. No. 91).

Holding money one knows is not one's own, without more, is not the same as an intentional act directed at injuring the owner. The record is clear that Axos mistakenly deposited the money into Lathers's account; Lathers took no action to cause those funds to be in his account.[85] From November 1, 2023, through January 29, 2024, the account balance never fell below $49,500.00, including after Lathers's $165,100.00 wire for his franchise closing on January 29, which still left the account at $55,521.50, more than Axos was owed.[86] As an accounting matter, then, Axos's money sat untouched through this entire span; even the one large, well-explained transaction in this period did not reach it. Lathers testified that he expected Axos to catch and reverse its own error, and that he regarded the extra money, in the meantime, as "a blessing in disguise."[87] When asked directly whether he understood that keeping the money would deprive Axos of funds belonging to it, he said he did not.[88] Even crediting a finding that Lathers knew by November 6 or 7, 2023, that the money was not legitimately his, knowledge alone is not an act. *Geiger* requires an intentional act that causes an intended or substantially certain injury, not a state of mind maintained during a period of inaction.[89] There is no act in this span for that

---

[85] Trial Tr. 49:13–20 (Dkt. No. 93).

[86] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-7); Trial Tr. 87:1–16 (Dkt. No. 93).

[87] Trial Tr. 88:15–89:25 (Dkt. No. 93).

[88] Trial Tr. 80:12–15 (Dkt. No. 93).

[89] See *Geiger*, 523 U.S. at 61–62; *Walker*, 48 F.3d at 1165 (willfulness requires that the debtor intended the act and either desired the consequences or believed they were substantially certain to result).

standard to attach to. Neither party has identified, and the Court has not found, authority holding that merely failing to volunteer the return of a mistaken deposit, without any accompanying use or dissipation of the specific funds, is itself the kind of intentional, injury-producing conduct Section 523(a)(6) requires. The Court holds that it is not, and that Lathers's conduct through January 29, 2024, standing alone, does not satisfy the willfulness element of Count IV.

3. Axos has not proven that Lathers knew he was using its money after January 29, 2024.

The account balance first fell below $49,500.00 on January 30, 2024, the day after the franchise closing. A $5,625.00 wire of unexplained purpose left the account at $50,768.38, still above the amount Axos was owed, and a further $10,000.00 transfer to another checking account of Lathers's own, ending in 7529, then brought the balance to $40,768.38.[90] No witness was asked about either transaction at trial. Further, the transaction that actually carried the receiving account below $49,500.00 moved $10,000.00 only into another checking account of Lathers's own rather than to a third party. Axos offered no evidence of what became of the funds in that second account or when the $32,407.29 still sitting in the receiving account on February 9, 2024, was ultimately spent. Lathers testified only in general terms that the money remaining in the account after January 29 went toward payroll and other costs of keeping the business running "until . . . revenue started to flow more smoothly," testimony that is consistent with ordinary, if troubled, business operation and does

[90] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-7).

not, by itself, show that he turned his mind to Axos's money specifically when he made either transfer.[91] The record is accordingly silent on the fact Section 523(a)(6) requires: whether Lathers knew, when he made either transfer, that it was Axos's money he was spending and that spending it would deprive Axos of funds belonging to it, as distinct from managing the same undifferentiated pool of funds he had been managing since November. No evidence was offered that Lathers knew the remaining account balance at any time after the $165,100.00 transfer left the account, or that he calculated what balance would remain after it.

The most direct evidence on this question cuts against Axos. On cross-examination, Axos's own counsel asked Lathers whether he was "aware that in keeping that money and not returning it, it would deprive Axos Bank of $49,500 that belonged to it." He answered, "I didn't know that."[92] That answer came in response to Axos's own question, on a point Axos bore the burden of proving, and counsel did not press further or return to the subject with a different question on redirect. Axos's remaining evidence on knowledge rests on Lathers's admission that he knew, from November 6 or 7, 2023 forward, that the second $49,500.00 was not his.[93] That admission is enough to support the conversion judgment on Count III, which does not

---

[91] Trial Tr. 87:13–16 (Dkt. No. 93).

[92] Trial Tr. 80:6–19 (Dkt. No. 93).

[93] Trial Tr. 80:6–8, 88:11–89:4 (Dkt. No. 93).

require an intent to deprive the owner of the property.[94] It is not, by itself, enough to show that any later transaction was an intentional act directed at that specific money.

*Geiger* and *Kane* require a belief, held at the time of the act, that injury to the particular property was substantially certain to follow, not a generalized awareness, carried for months beforehand, that some money in a commingled account was not his.[95] The clearest concession on this point came not from Lathers, but from Axos's own witness. Cross-examining Axos's corporate representative, Brian Shellmire, Lathers, proceeding pro se, asked him to confirm that Axos had no email or statement from November 2023 showing that Lathers intended to hurt Axos Bank; Shellmire answered, "No."[96]

Axos renews the same sophistication argument for this later period. The same limit applies: capacity to understand is not evidence of what Lathers actually turned his mind to at the moment of a specific transaction.[97] Sophistication of this kind speaks to capacity, not to the specific, contemporaneous knowledge *Geiger* and *Kane* require. A debtor who testified that he does not parse loan documents the way a lawyer does and "barely read[s]" his own bank statements is not shown, by his credentials alone, to have turned his mind to Axos's money at the moment he made any particular transaction, and Axos identifies no testimony or exhibit in which

---

[94] *See Seymour*, 638 So. 2d at 1047; *City of Cars*, 526 So. 2d at 120.

[95] See *Geiger*, 523 U.S. at 61–62; *Kane*, 755 F.3d at 1293.

[96] Trial Tr. 53:25–54:3 (Dkt. No. 93).

[97] Pl.'s Written Closing Arg. (Dkt. No. 91) (citing Trial Tr. 57:19–25; 58:13–59:3; 70:15–18; 77:23–78:8).

Lathers's financial background is tied to a specific act rather than offered as a general inference about what someone with his résumé must have understood.[98] The Court gives the point the weight it can bear but not the weight Axos asks it to bear alone.

The testimony that otherwise exists points the same way. Lathers testified that he was not following his checking accounts closely while the loan proceeds were arriving, and that he was focused on reaching a franchise acquisition cost he estimated at about $205,000.00 in the aggregate, not on any one lender's contribution to that total.[99] Pressed on why he did not notice receiving $99,000.00 from Axos rather than $49,500.00, he testified that treating it as significant was "not the case" because he was "doing an acquisition . . . to get over $200,000," and the amount he received from Axos was well within the $200,000 total he was seeking, so he did not notice it one way or the other.[100] That is testimony describing someone managing toward an aggregate number, not someone keeping a running account of which dollars were his and which were Axos's.

Nor is there evidence of when Lathers learned how far the balance had actually fallen. By February 9, 2024, before Axos ever contacted him, the account held $32,407.29, below the $49,500.00 Axos was owed.[101] But no witness was asked, and nothing in the record shows when Lathers became aware of that balance, as opposed

[98] Trial Tr. 58:1–17 (Dkt. No. 93).

[99] Trial Tr. 63:17–21, 74:11–18 (Dkt. No. 93).

[100] Trial Tr. 64:21–65:18 (Dkt. No. 93).

[101] USAA Bank Statement (Acct. No. xxxxxx4161) (Dkt. No. 81-7); Trial Tr. 87:22–88:4 (Dkt. No. 93).

to learning of it only later, from this litigation or from Axos's own February inquiries. A fact the bank statements establish in hindsight is not evidence of what the debtor knew at the time, and Axos has not filled that gap.

Axos's closing argument cites several additional cases for the proposition that a debtor who converts funds he knows belong to another commits a willful and malicious injury as a matter of course.[102] Each of those cases found nondischargeability on facts materially different from these. *Ogden* and *Petsch* involved debtors who sold collateral they had expressly pledged to a secured lender, in plain violation of a security agreement each debtor had signed and understood; the debtor in *Petsch* went further and obtained a duplicate certificate of title to conceal the sale.[103] *Rowland* involved a contractor who had assigned his bank an interest in specific construction loan proceeds, deposited a check whose restrictive endorsement had been altered to remove the bank as a payee, and "testified that he was aware that Bank had an interest in the Check and that Bank would be injured if he kept the proceeds of the Check for himself."[104] *Printy* involved an account holder who knew, because he knew his trust's actual holdings, that a multimillion-dollar credit to his brokerage account was the product of a computer error, and who nonetheless

---

[102] Pl.'s Written Closing Arg. (Dkt. No. 91) (citing *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853 (1st Cir. 1997); *Barnett Bank of Columbia Cnty. v. Ogden (In re Ogden)*, 119 B.R. 277 (Bankr. M.D. Fla. 1990); *Hardwick v. Petsch (In re Petsch)*, 82 B.R. 605 (Bankr. M.D. Fla. 1988); *Bank of Lumber City v. Rowland (In re Rowland)*, 316 B.R. 759, 764 (Bankr. S.D. Ga. 2004); and *McNulty v. Palecki (In re Palecki)*, 667 B.R. 581 (Bankr. D. Colo. 2025)).

[103] *Ogden*, 119 B.R. at 277–79; *Petsch*, 82 B.R. at 605–07.

[104] *Rowland*, 316 B.R. at 763–64.

borrowed against the inflated balance and withdrew hundreds of thousands of dollars before the error could be corrected.[105] *Palecki* involved a contractor who received a client's deposit earmarked for one specific renovation project, admitted he knew the deposit was to be used only for that project, and within a month spent the entire sum on other jobs and on his own personal expenses while concealing that he was not a licensed contractor.[106]

In each of those cases, the debtor had specific, contemporaneous knowledge of a security interest he had agreed to honor, or of an error he recognized in real time, and took an affirmative, often concealed, step to defeat it. Lathers, by contrast, held no security agreement with Axos respecting these funds, took no equivalent affirmative step to conceal the duplicate deposit, and, when asked the question most of these cases answer by inference from clearer facts — whether he understood that keeping the money would deprive Axos of what belonged to it — answered that he did not.[107]

There is a more pointed version of the same argument worth addressing. A sum equal to Axos's $49,500.00 sat available and untouched in the account for nearly three months, long enough that Lathers could have repaid it at any point between November 1, 2023, and January 29, 2024, simply by leaving that sum alone while he made other withdrawals. One could read that survival not as evidence of inattention

[105] *Printy*, 110 F.3d at 854–57. *Printy* predates *Geiger* by roughly a year and is, in any event, First Circuit authority not binding on this Court.

[106] *McNulty v. Palecki (In re Palecki),* 667 B.R. 581 (Bankr. D. Colo. 2025).

[107] Trial Tr. 80:12–15 (Dkt. No. 93).

but as evidence that Lathers was tracking his balance closely enough to keep a cushion above $49,500.00, so that his eventual decision to let the balance fall below it on January 30, 2024, was a conscious choice to start spending Axos's money specifically, made only once the pressure of the failing franchise left him no other choice. The Court has considered this reading and does not find it more likely than the alternative. Lathers's own testimony is that he was watching an aggregate acquisition target of roughly $205,000.00 across several loans, not a $49,500.00 floor tied to Axos in particular,[108] and nothing in the record shows he calculated, before making the $5,625.00 wire or the $10,000.00 transfer to his other account on January 30, that either transaction would cross that specific threshold. A debtor who happens to leave a sufficient cushion in an active, heavily used account for ninety days, while pursuing a franchise acquisition several times the size of that cushion, has not shown that he was watching the cushion itself. The more mundane explanation, that the account simply had enough money in it until it did not, is at least as consistent with this record. Axos, not Lathers, bears the burden of showing otherwise.

The Court has considered, and rejects, a broader version of Axos's argument that does not depend on any single transaction: that the arc of Lathers's conduct as a whole — knowing by November 2023 the money was not his, never returning it, continuing to operate the account and the franchise without setting anything aside, declining to cooperate once Axos finally asked, and repaying nothing to this day — circumstantially shows that he was, throughout, knowingly and intentionally using

---

[108] Trial Tr. 64:21–65:18, 79:10–18 (Dkt. No. 93).

Axos's money for his own benefit. The Court may draw reasonable inferences about a debtor's knowledge from circumstantial evidence of this kind.[109] But circumstantial evidence must make the specific inference Axos needs more likely than not, not merely available as one reading among others. The direct testimony in this record — that Lathers expected Axos to "automatically back that out," that he treated the extra deposit as "a blessing in disguise," that he "wasn't following" his checking accounts while the loan proceeds were arriving, and that he did not know keeping the money would deprive Axos of funds belonging to it — supports an explanation of carelessness and financial disorganization at least as readily as it supports deliberate appropriation.[110] Where the circumstantial record is genuinely balanced between an innocent and a culpable reading, and Axos bears the burden of proof, that balance favors Lathers, not Axos.

Nor does it help to relocate the inquiry to a point after Axos's February 2024 contact. By then, the account balance had already fallen below $49,500.00, so if Lathers checked his balance at any point after Cardenas's calls and emails, he would have seen that the account no longer held what Axos was owed. But no evidence shows that he did: no witness was asked whether or when he reviewed his balance after February 2024, and nothing in the record places him looking at an itemized statement at any point following Axos's contact, let alone its March 1 written demand,

---

[109] See *Rensin*, 597 B.R. at 188–89.

[110] Trial Tr. 88:15–89:25 (Dkt. No. 93); Trial Tr. 63:17–21, 74:11–18 (Dkt. No. 93); Trial Tr. 80:12–15 (Dkt. No. 93).

which Lathers testified he never received. The same is true if the inquiry is pushed further still, to whenever Lathers ultimately filed this Chapter 7 case: by then the specific $49,500.00 had already been gone, in the tracing sense described above, for the better part of a year, and what remained was an acknowledged, unpaid debt rather than an identifiable sum he could still be said to be spending. A debtor's knowledge that he owes a debt he cannot pay, without more, describes an ordinary Chapter 7 case; it is not evidence that any earlier act was directed at the creditor's property, and the Court declines to treat insolvency and nonpayment, by themselves, as proof of the intentional injury element Section 523(a)(6) requires.

Lathers's refusal to cooperate once Axos reached him in February 2024 does not fill the gap either, because by then the specific $49,500.00 was no longer traceable in the account.[111] A later unwillingness to admit or correct a mistake he could no longer undo is evidence of an inability to pay and a wish to avoid an uncomfortable conversation, not proof of the state of mind he held when he made the transfers weeks earlier; that the decision to let the matter proceed through "legal channels" followed consultation with counsel further undercuts any inference of consciousness of wrongdoing, whatever the substance of that privileged advice may have been.[112] Axos's own three-and-a-half-month delay in discovering its error, and its modest response once it did — a handful of emails and a letter, with no suit filed until the bankruptcy forced the issue — is consistent with, and corroborates, an understanding

[111] Trial Tr. 94:5–9 (Dkt. No. 93).

[112] Trial Tr. 93:7–94:4, 94:16–95:7 (Dkt. No. 93).

by both sides at the time that this was an administrative error to be sorted out rather than a theft in progress.[113] Because Axos has not proven willfulness, the Court need not separately decide malice. The same gap in the evidence — the absence of any shown intent, at the time of any specific transaction, to single out Axos's money for use — would likely preclude that finding as well.

4. The debt is not excepted from discharge.

Axos proved its conversion claim and is entitled to judgment on Count III, but it has not proven, by a preponderance of the evidence, that Lathers's conduct was a willful and malicious injury within the meaning of Section 523(a)(6). The resulting debt is an ordinary debt subject to Lathers's Chapter 7 discharge. Having determined that the conversion debt is not excepted from discharge, the Court turns next to prejudgment interest and fees on the Count III judgment.

E. Axos is entitled to prejudgment interest but not attorneys' fees.

Under Florida's loss theory, prejudgment interest is an element of pecuniary damages, and not a penalty. It compensates for the loss of the use of money and accrues, as a matter of law, from the date of the loss rather than from the date of demand or the date of judgment.[114] Once liability and the amount of a loss are fixed, the plaintiff is entitled to interest from that date even though the exact figure was not liquidated until later.

---

[113] Trial Tr. 38:14–40:16 (Dkt. No. 93); Pl.'s Ex. 8 (Dkt. No. 81-8).

[114] *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 214–15 (Fla. 1985).

Because Lathers's wrongful dominion arose from his own knowledge rather than from Axos's demand, the loss for interest purposes is not tied to the date of any demand either, regardless of whether that demand was ever proven received. The loss occurred, for interest purposes, on January 30, 2024. Before that date, the account balance never fell below $49,500.00, so Axos's money remained, as a practical and evidentiary matter, continuously present in the account into which Axos deposited it; the transfers on January 30, 2024, were the first in the evidentiary record to reduce that account below the amount Axos was owed, and because Lathers stipulated that he eventually spent the entire duplicate deposit, the Court fixes the accrual date there.[115] Axos is accordingly entitled to prejudgment interest on $49,500.00 from January 30, 2024, through the date of judgment, at the statutory rate or rates in effect over that period. Neither party's closing argument addressed the accrual date for interest; the Court reaches it from the trial exhibits already in evidence.

Axos is not entitled to attorneys' fees. Under Florida law, attorneys' fees are awarded only when authorized by statute or contract, and Axos has identified no statute authorizing fees for conversion.[116] The Note authorizes reasonable fees incurred upon a default in Lathers's obligations under the Note,[117] and the duplicate deposit was never such an obligation; that is why Count I failed. The fee provision

---

[115] USAA Bank Statements (Acct. No. xxxxxx4161) (Dkt. Nos. 81-5 to 81-7).

[116] *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1329 (11th Cir. 1998).

[117] Note ¶ 7 (Dkt. No. 81-1).

does not convert this separate tort debt into a contractual one. Axos may recover taxable costs as the prevailing party, subject to a timely bill of costs and any objection by Lathers.[118]

## V. CONCLUSION

Axos proved its conversion claim: Lathers received a duplicate deposit, knew within days that it was not legitimately his, and retained and spent it anyway. Florida law required nothing more. Axos did not prove that Lathers's conduct was a willful and malicious injury within the meaning of Section 523(a)(6). The record shows that Lathers knew the money was not his, but not that he turned his mind to Axos's money specifically at the moment he spent it. The resulting debt remains an ordinary debt, subject to discharge. None of this means Lathers's conduct was blameless; it means only that Section 523(a)(6), which asks for intent rather than carelessness, is not the vehicle for it, and the Court will not lower that bar.

Accordingly, the Court **ORDERS**:

1. Judgment is entered for Axos Bank on Count III, for Kendall Odell Lathers on Counts I and IV, and Count II is dismissed as moot.

2. On Count III, judgment is entered for Axos Bank in the principal amount of $49,500.00, plus prejudgment interest from January 30, 2024, through the date of judgment, at the statutory rate or rates in effect under § 55.03, Florida Statutes.

3. On Count IV, judgment is entered for Kendall Odell Lathers. The debt awarded on Count III, including prejudgment interest, is not excepted from Lathers's

[118] Fed. R. Bankr. P. 7054(b); Local Rule 7054-1.

discharge under 11 U.S.C. § 523(a)(6), and Axos Bank's recourse, if any, is through the claims process in Lathers's main bankruptcy case, Case No. 25-11757-PDR.

4. Axos Bank's request for attorneys' fees is **DENIED**. Axos Bank may seek taxable costs as the prevailing party, subject to a timely bill of costs and any objection by Lathers.

5. The Court will enter a separate final judgment.

###

Copies to:
All parties in interest.